Here ye, here ye, here ye, this Honorable Appellate Court of the 2nd District is open for pursuant to adjournment. The Honorable Michael J. Burke presiding. Please be seated. We're on this first case of the morning, 12-12-23-4. Commonwealth Edison Company v. Illinois Commerce Commission, People of the State of Illinois. At all. On behalf of Commonwealth Edison, Mr. Matthew Lee Price. On behalf of the Illinois Commerce Commission, Mr. James E. Wedgey. On behalf of the people of the State of Illinois, Mr. Chris Burke. Thank you, Mr. Price. You may be seated. Your Honor, and may it please the Court, my name is Matthew Price on behalf of Commonwealth Edison Company. Everyone agrees in this case that the time period for a potential refund began on September 30, 2010, when this Court issued its decision in the last appeal of this case. And it continued until May 31, 2011, when the Commission issued a new rate order setting new rates. And everyone also agrees that any refund should be based on the actual revenues that ComEd collected during the 2010-2011 refund period. And that's what the Commission did here. It used ComEd's revenue data from the 2010-2011 refund period to calculate the amount of the refund. Even though the Commission obviously didn't have that data available to it way back in 2008 when it issued its original order in this case. But the case law tells us they have to use the actual revenues, not projected revenues. That's exactly right, Your Honor. And the question before this Court today is whether the Commission should match ComEd's 2010-2011 revenue data against the value of ComEd's rate base for the same period. Or instead, it should match 2010-2011 revenue data against the value of ComEd's rate base in some other prior period. And what the Commission did here is in calculating the refund, it matched the revenue from 2010-2011 against the value of the rate base as it stood back in 2006-2007. And on that basis, it concluded that a refund was required. Again, isn't that what the case law says, though, that you're supposed to look at what would have been ordered under the rates had they been ordered pursuant to the Court's opinion? Well, no, Your Honor. In the last opinion in this case, this Court instructed that basic matching principles require the Commission to match revenue data and rate base data over the same period. And the entire purpose of the Court's remand of this case was to ensure that the Commission followed the matching principle by calculating the value of ComEd's invested capital over a consistent time period. So the Court held that the Commission had errored when it matched the rate base from one period against accumulated depreciation from another period. And it said, Commission, you have to go back to account for increases and decreases in investment value over the same time period. And the basic matching principles require the matching of revenue, operating expenses, and rate base from the same period. That was the premise of the remand in this case. I mean, the language, the specific language you're relying on to make that point from that prior disposition can be found where? Well, at 405 Illinois Act III, 395-96. At 405 and also at 407, the Court repeatedly discussed the importance of matching principles, the idea that in order to avoid inconsistencies and miscalculations, it's important to treat revenues and rate base from the same period rather than from different periods. That was the premise of the remand, and that's precisely what the Commission failed to do. But that's a limited period of the pro forma adjustments we're talking about. I mean, when we're talking about the matching principles with accumulated depreciation, the pro forma adjustments are a deviation from the test year period rate making. So we were talking about the period of pro forma adjustments, and we have to use basic or match up things during that period. Not the entire rate. You understand what I'm saying? Not the entire rate order. Just that period we're talking about, matching up the projected plan additions with the accumulated depreciation during that exception period to the test year approach. Well, the Court's decision in that case discusses the importance of the matching principle more broadly, and I can direct this Court's attention to page, this is page 395-96. The Court wrote, the Supreme Court explained that the purpose of the test year rules is to prevent a utility from overstating its revenue requirement by mismatching low revenue data from one year with high expense data from another year. And the Court repeated, and this is at 407, that, I'm sorry, at 405, that to determine just and reasonable rates, the utility's rate base, operating costs, and revenues are matched over the test year. So the point is that the Court recognized the importance of treating all the inputs into determination of what a just and reasonable rate is over a consistent time period. And what the Court has instructed in its refund cases, in Hartigan specifically, is that the way a refund should be calculated is by looking at the amount that was collected under the invalid rates and comparing that to the amount that would be collected under a just and reasonable rate. And again, the passage that I just referred this Court to from the prior decision makes clear that a just and reasonable rate is one that matches revenues, operating expenses, and rate base over a consistent time period. And that's what the Commission failed to do here when it treated revenues from 2010 and 2011 against a rate base that was five years old at that point and did not reflect the hundreds of millions of dollars of investment. But the revenues were based on the rate order that was entered in 2007. And we're talking about the difference between what was collected under the 2007 rate order and what would have been collected under the 2007 rate order if the Commission had followed what we said in the opinion. Not projecting out to what actually happens after that. Actually, you look at the revenues actually collected, of course, under Illinois independent voters in Hartigan, but you match that against what would have been collected under the 2007 rate, not in actuality, but under the 2007 rate had it been properly issued. Had the rate order been properly issued. That is what the Commission did here, but that is not the approach that the Supreme Court instructed in Hartigan. And I can, if you'd like, it's a complicated case. I can try to explain what happened in Hartigan. I know what happened in Hartigan. Okay, go ahead. And I know what happened in Hartigan. So in Hartigan, I want to focus on the refund period for the year 1989. And what happened is there was a rate order that was issued in 1985 that allowed ComEd to recover certain costs. That was invalidated on appeal. And the question is what should the refund period be for the year 1989? And the Commission had indicated its intent to place new rates into effect prospectively beginning in 1989, but that had been vacated in a separate rate order proceeding. And what the Supreme Court said is we don't know what the refund should be for the year 1989 because we don't know what adjusting reasonable rate for that year would be. And the Commission has to go figure that out. And when it does calculate adjusting reasonable rate for 1989, it needs to account for the fact that, in the meantime, ComEd has invested substantial capital in building new plants. And it specifically talks about the fact that three new nuclear facilities have been rate-based since 1985 when the initial rate order was put into place, and 1989 when the court needs to figure out what the appropriate refund amount is. So in Hartigan, the court was not looking at simply taking out the costs from the old 1985 rate order and using that to calculate the refund. It was accounting for the fact that, in the interim, there were hundreds of millions of dollars of investment that had been made, and that should be considered when calculating what adjusting reasonable rate during the refund period would be. Well, what part, if any, did the stay that was issued in Hartigan play into this decision? Because we don't have any stay here. And Hartigan seems to rely rather heavily on the fact that their IVI, I think it was, or somebody went in and got a stay. And that created some of the problems. So what – with the explanation you just gave us, what part does that stay play? Well, I don't think that stay played any part in the explanation of how the Supreme Court determined how refunds should be calculated. The stay was relevant, I believe, to the fact that Kahneman had essentially agreed to the prospect that there may be a refund in that case, and so was putting money in escrow. And I think the stay may have been relevant to that part of the procedural history. But in terms of the calculation of the refund, I don't believe the stay played any role, any role at all of that. I don't think that's a material distinction between Hartigan and this case. So you posit that we should use the 2010 rate numbers from the 2010 rate case in order to set these actual operating costs, correct? Well, that's right, Your Honor. And you're basically comparing the 2010 rate order in our case with rate order two in Hartigan. Well, I'm comparing the 2010 rate order in our case actually to the rate order that the Supreme Court knew would be issued for 1989 but hadn't been issued yet. And the argument was made in Hartigan, you know, the commission can't look to this new rate order that hasn't been issued yet to determine what just and reasonable rates for 1989 were going to be because the Supreme Court was running in 1992. Because the argument was made, that rate is going to only apply prospectively. You can't use it to figure out retrospectively what the just and reasonable rate for 1989 was. And the Supreme Court rejected that argument. It said, it's true the commission doesn't have power to engage in retroactive rate making. However, and I can direct this court to the particular passage. It's on page 148 ill second at 412. The court said, however, the instant case involves a judicially established refund of money. And a refund encompasses the difference between the money collected pursuant to the invalid rate and the money that would have been collected pursuant to a just and reasonable rate. And then it goes on to explain that the just and reasonable rate should account for the fact that between 1985 and 89, that ComEd had invested in these three new nuclear facilities that were not reflected in the 1985 rates. And moreover, accounting for that increase in investment value over that period is consistent with the equitable nature of a refund. The purpose of a refund, as the Supreme Court explained in Independent Voters and also in Hartigan, is to prevent unjust enrichment. It's to make sure that customers are not paying more than the fair value of the service they receive. So do we end there, though? Do we end right at just the operating expenses? Do we only look at the 2010 rate case and look at operating expenses, and then we compare that to the revenues? Well, you're on a rate case. My question is, does it open the door? I mean, what if your return on investment was better during that time period, which is totally different than anything we're talking about here? So now we're actually, should we look at whether ComEd's return on investment was better and then offset that against this? Well, Your Honor, as a matter of fact, does it reopen the entire rate case? I don't think it does reopen the entire rate case, no. I think that this is an exercise that has been performed in the wake of Hartigan and can be performed easily. Certainly in this case, there's no administrative difficulty in figuring out what the right answer is. Because of the 2010 rate case? Because of the 2010 rate case. What if that's reversed? That's on appeal right now. That appeal has been dismissed, Your Honor. Oh, it's been dismissed? Yes. So there is nothing on appeal? No. But let's say we engage in this approach, and now that's the way that you're saying we should do it from now on. So let's just assume that appeal is still pending. What if that case gets reversed? So then this has to be reversed and redone again? Well, I don't think so, Your Honor. What happened on remand in this case is that ComEd came forth with evidence about what its actual costs were during that period. There was testimony to that effect that the Commission refused to consider because it regarded it as irrelevant to the legal issue in the case. And so ComEd placed that testimony in the record, and the Commission could have evaluated that testimony. It could have been testimony from the Commission or from the Attorney General or other parties disputing ComEd's claim as to what its actual costs were. If the Commission had considered that evidence, said, you know what, we are going to consider that evidence, would it not then open the door to the interveners presenting other evidence regarding other things that would play on this, such as, again, return on investment, which is something we're not talking about here? Wouldn't that open the door to that? Wouldn't the interveners then be allowed to present that as far as calculating a refund? I suppose they could. So you're reopening the entire rate case. Well, I don't think so, Your Honor. Which violates test year principles. It doesn't violate test year principles to match revenue and costs from the same time period. And I'd add that if there was actually evidence that ComEd submitted concerning its return on equity in this case, and the evidence it submitted was precisely because it had made these substantial investments that were not reflected in the rates that it was charging. Its return on investment during the relevant time period was lower than the return on the investment that the Commission had said would be a just and reasonable return on investment. And that was part of the reason why the Commission ordered an increase in rates when it set new rates in May of 2011. But it doesn't consider actual revenue, right? I'm sorry. Actual revenue is not considered. It's this projected revenue, correct? Actual revenue is what the Commission considered in setting the refund, if I understand Your Honor's question correctly. But then not the actual expenses? Is that the gist of your argument? That's right. The gist of the argument is that it used actual revenue numbers from 2010 and 2011, but then it used cost numbers and rate-based numbers from 2007 and 2008. So there's a mismatching. And it should look at the numbers from a consistent time period to get an accurate reflection of what a just and reasonable rate would be and what the investment value that ComEd actually dedicated to serving customers during the period in question. Would you like to address third-quarter plant additions? Yes. Thank you, Your Honor. So the second issue in this case is if this Court does determine it should match actual revenues to the value of ComEd's invested capital back in 2007-2008 when the Commission issued the first order. The Commission erred by refusing to account for the third-quarter 2008 plant additions. And there's three points I want to make about this issue. The first is that this Court made very clear in the last appeal of this case that that was a matter of fact that the Commission had never made any findings on, that it hadn't reached any conclusion on, and the Court determined that it would be manifestly unfair for the Commission to preclude ComEd's ability to seek recovery of those costs and directed the Commission on remand to allow ComEd to do so. And then on remand, the Commission said, actually, we did already make a finding, and so we don't need to think about this issue again. And, you know, respectfully, we feel that that is inconsistent with this Court's mandate. It's inconsistent with what the Commission told the Court in its brief to this Court when it said, the Commission said we can't know what position we would take on these plant additions. I mean, in a roundabout way, and I understand procedurally it's an odd way of doing things, especially since they didn't argue that on the original appeal. But did they, in essence, now make a finding, saying based upon the testimony that was presented before? I know they're saying that we, in essence, implicitly denied third-quarter plant, but can't we take that as a finding of fact now? Well, if the Court does that, and this was my second point, if I may, if the Court accepts that the Commission did that, it would need to reverse that finding as arbitrary and capricious and unsupported by the evidence. And the reason is this. The Commission provided a specific rationale for that finding, which was, and this is at page 848 of our appendix, in Sir Rebuttal Testimony, ComEd did not address Staff Witness Griffin's continued opposition and rebuttal testimony to the inclusion of the third-quarter plant. So the Commission, in other words, didn't weigh the evidence on both sides. It ruled that ComEd had essentially forfeited the issue by not responding to rebuttal testimony. And that is contrary to the evidence in the record. Haussler and Frank, Sir Rebuttal Testimony, specifically respond to the rebuttal testimony of Staff Witness Griffin, and that's at 7145 and 7146 of the Commission record. And also the Donnelly Testimony, which is at 7066 of the Commission record, specifically responds to it. And it's significant that neither the Commission nor the AG defend the Commission's own reasoning for this purported fact finding. Instead, they invent their own hypothetical post hoc rationale for it. But the Court needs to review the finding based on the rationale that the Commission itself gave. And if I may, Your Honor, I know my time has expired, but can I quickly make my third point? Thank you. Even if the Commission had weighed the evidence, the Commission's finding would still be arbitrary and capricious because we now know that in that third quarter, ComEd made $160 million of investment. And the basis of the opposition to the inclusion of that third-quarter plant was that it was not known and measurable. In other words, it was too speculative or uncertain whether the investments would occur or not. But we now know they did occur. And we're talking about concrete things like replacement of transformers and underground cable and storm hardening. These are things that customers used and were serving them during the entire period here, between 2008 and 2011. And it doesn't make logical sense to exclude those on the basis that they're too speculative when we know the investments occurred. If there are no further questions, thank you, Your Honor. Thank you, Counselor. You have time for rebuttal argument. Thank you. Who wishes to go first? I will go first. James E. Wegging, Special Assistant Attorney General. I'm going to have to respond to the Illinois Commerce Commission. We've agreed to split the time with the people. Have you split the issues, too, or are you just going to address all the issues? Well, I will try to address all the issues. Okay. Can you start with this then, the last point Counsel made, that the Commission didn't actually weigh the evidence? Well, Your Honor, Because the finding was that ComEd didn't supply server bottle testimony to Griffin's testimony. Well, the Commission's decision here then was that because of the non-unanimous nature of the stipulation between ComEd and staff, no one else signed off on it, and the Commission didn't approve that stipulation as part of this case. And under the teachings of Illinois law, that stipulation did not become a finding of the Commission. And this gets you into a point. The staff originally had opposed the three quarters of the 2008 pro forma capital adjustments on the basis they weren't known and measurable. With additional evidence, staff agreed to the first two quarters because those first two quarters were summer critical, and that was entered into the stipulation. But the third quarter was not agreed to. You have this kind of, so the Commission must necessarily have ruled on that, essentially what the Commission, it must have ruled on that by rejecting it because ComEd never withdrew its position it should get the third quarter. And that was kind of the basis of it all. Well, but in conducting this full BPI so-called analysis, did the Commission err in not weighing the server bottle testimony and basically made a factual misstatement when it said that there was no server bottle testimony to Griffin's testimony? No, it didn't make a fact that ComEd presented no server bottle. That wasn't the basis of the Commission's decision. It's a single sentence on page 45 of the Commission order that just mentions, in fact, ComEd did not present additional evidence on the matter. The basis of the Commission ruling is the non-unanimous nature of the settlement between staff and ComEd. Do you agree that ComEd did present server bottle testimony regarding the third quarter? No, they didn't. In fact, they did not present any server bottle testimony. So on page 18 of the yellow brief, ComEd's yellow brief, where they cite server bottle testimony, that's not, that wasn't server bottle testimony in the third quarter plan? I don't believe so. I believe that the, well, Your Honor, I'll take a look at that again in the record. I don't, but I don't believe there was server bottle testimony presented by ComEd seeking that. They had entered into the stipulation, so they didn't further pursue it. And I thought I was reading the record correctly. In any event, Your Honor, the third quarter pro forma capital adjustment at this point is strictly a make weight as a reduction of the refund being ordered herein. And there's this underlying issue that since it no longer will control the rates being charged, whether or not the issue was rendered moot because of the new rate case. That was presented, and the Commission did not so rule, but the parties did present that to the Commission. They said, well, why are we looking at this? All we've got left now is the term of the refund. We're not setting the rates anymore. I mean, we're kind of retrospectively setting rates to determine what a proper rate would have been. We were setting, we were determining what would have been the rates had we done it properly in the first place to determine what the difference between what we had set and what we should have set was. Right, and we told you to consider third quarter plan at the request of third quarter plan. And the Commission did consider it, but as the parties, the people especially pointed out, that there had been a non-unanimous settlement. So inherently it had been rejected by the Commission in the first order without a written finding. We've now provided that finding. Why didn't you say that in your first brief, in the first go around in this case? Well, that gets you an interesting point, Your Honor. The issue was various things, and then comments said, well, we would never agree to the stipulation if the accumulated depreciation of the test year had been moved to the end of the pro forma period. That's their position. I have no idea. They made the linkage. We did not. So they said that, and they said it would be unfair to hold them to the stipulation. And then they said, and then ordered the Commission to grant us the third quarter, which we vigorously opposed. We said, I don't know what the Commission would do on remand, but that the Court shouldn't order us to grant something that staff evidence was against. Now they're arguing we should have carefully looked into the stipulation, but the stipulation itself was not really before the Court. It was only their claim of linkage and how it would be unfair to them. I'm just saying the argument is different now than it was then. Yes. You did not argue then. I don't know if you wrote the brief back in the day. I couldn't have argued that. There was no written finding in the Commission report. You're arguing it now. How could you not have argued it then that it was implicit in the 2007 rate order that was denied? That wasn't obvious to me at the time. As I said, what I told the Court was I wasn't sure what would happen on remand. I didn't know if staff would change its position and say grant the third quarter, perform capital adjustments. I didn't know what the Commission would ultimately rule on the issue. I didn't know what the other parties would argue. As I said, some of them argued rudeness on the basis that this shouldn't even be bothered with at this point. I could not have guessed what my client would say, and it's their decision to say what they wanted to do. Nonetheless, it's really clear the Commission has rejected the third quarter capital adjustments as being proper within the context of this great case, with its 2006 test year, would perform capital adjustments for four quarters in 2007 and two in 2008, the first two quarters of 2008. If the Court has any further questions on the third quarter? You can shift gears to the actual costs, whether we should be considering actual costs. Yes. Your Honor, I think the counsel for comment has pointed out that he's relying on the Hartigan decision, the 148.1.2, Act 405, which the first sentence from the Supreme Court said, turning to the terms the circuit court established pursuant to its retained equitable jurisdiction over the refund. Yes, all of that dealt with what the Court ultimately held as an equitable escrow fund that the Court held in its hands to determine what kind of a refund it would be. It wasn't addressing the refund under the IBI scenario, which is what was before the Court, that the Court reversed the Commission. By the time the remand got back to us, we had a new rate case. We did what the Court told us to do in the new rate case. And then the Supreme Court held in IBI there was a refund from the date of the Court reversal to the date the Commission or the tariffs complying with that reversal are entered. Does Hartigan say we're supposed to consider actual costs along with actual? First of all, Hartigan does say, and IBI, we're to consider actual revenues, correct? Collected under the faulty rate order. Yes, but in IBI, the Supreme Court rejected. Illinois bills are a similar argument that the Commission rates are too low and we do this mini rate case to determine what happened. Let's take, Your Honor, for example, what would happen if there was no new rate case? In this case, it had been remanded down to us. We would have considered the third quarter pro forma capital adjustments. We would not have readjusted the 2007, the first two quarters of the 2008 to determine what everything is. The answer is that a pro forma capital adjustment under the Commission rule is not all the just and reasonable amounts that are later historically are collected later. Historically, it looks as to what we were looking at in 2006. Known and measurable changes are not the same. It's all just and reasonable investments of the company. Companies that say, oh, we're going to do a project this year, that year, but it's too indefinite, the amount of money is too indefinite, it's not known and measurable. The moment when you start substituting a complete separate rate case for what actually the rule is just out of the window, we aren't legally allowed to have a two-and-a-half-year test year. The only test year is the 2006, and the pro forma adjustments, which could be more than capital items, although that seems to be the only issue that ever gets raised, we're not doing a complete rate case for 2007 and the first two or three quarters of 2008. We're only looking at known and measurable capital adjustments. The moment you start substituting, to be honest with you, the bottom line here, if the utilities are allowed to bring in just and reasonable, there's never going to be a refund. They're always going to come in with evidence to show that the commission rates during the period were too low, and therefore the continued collection produced no adjustment enrichment, which was rejected by the Supreme Court and IBI, along with the idea that these refunds have anything to do with unlawful gain. Hartigan did have one effect on the IBI scenario, which was to say that this is not a reparation under statute. We're about two months short of the commission for 100 years having reparation jurisdiction over utilities. But they held that wasn't a reparation either. When you look at all these equity arguments, the court has mainly rejected them. Counsel cites the language in Hartigan that the actual costs were considered in Rate Order 2 in Hartigan, and therefore we should consider the actual costs in the refund order here. Yes. That was because the court was reviewing that. I pointed out that on the further remand from Hartigan 2, which was for 1989, 1990, and three months in 1991, the commission used the 1989 data, which was the test year for that period, and rejected comments attempting to bring in the later 1990 claims on the basis that they were outside the test year. Now, you have in Hartigan 2 the second order with the test year in the court and what the commission did, and the court was affirming that. However, that's still not the same as saying any time there's a refund that there's supposed to be this completely new unrelated case to the 2006 test year as we look as to what the company was doing in 2011. That, I can say, is what the Supreme Court rejected when Illinois Bell suggested it. It just will not stand muster as if this refund is actually to take place. The customers have paid in on the basis of the existing rates, not on the basis of, oh, and they owe additional money for that period because had the rates been reset every day or every month, they would have been paying more. Honestly, I don't have anything further unless the court has a question. All right, counsel, thank you. Thank you. Mr. Turner, you may proceed. Mr. Turner, good morning. Maybe you could start with the issue of Hartigan and whether Hartigan, the language in Hartigan supports Ken Wolf Edison's argument that actual costs, which appear to be in contravention to the holding of independent voters, that actual costs are considered. Yes, Your Honor, and that is a central issue. The central issue in this case has been identified whether or not the commission had abused its discretion when it ordered the refund based upon that difference between the rates that the actual revenues collected under the reversed rates and the revenues that would have been collected under the rates if they were held in accordance with this court's prior opinion. The comment is arguing, yes, it was, basically, in Hartigan. But Hartigan did not change the law. Hartigan was very clear in the Hartigan decision back at page 397 to 398 that the refund remedy that was provided was provided to independent voters and it was still good and it applied to that case in the Hartigan 2 decision and it was the remedy as delineated in independent voters. Now, there was an argument about actual revenues, about whether or not that required also use of actual costs. Hartigan 2 actually rejected the argument saying it wouldn't offset the refund by that amount. It did have some language there saying that the rate order 2, that is the rate order of remand, would consider actual operating costs, but it never specified or indicated or suggested that it was talking about the actual operating costs during the refund period. So the actual operating costs were entirely at issue in the Hartigan 2 decision. It had gone up in Hartigan 1 and they were looking at historical costs back in both the 1984 test year, the 1985 pro forma period, in that case for the Byron 1 plant and the facility that was the basis for the rate increase in that litigation, and actually looking historically all the way back to 1973 and looking at the costs that were involved and whether they were possibly reasonable or not. And the court, the case had gone back on remand and actually the court even required a second audit of the historical data. So the amounts were changing, but the Hartigan never in any way suggested that it was changing the law in independent voters, it was now reversing or somehow narrowing independent voters, even though, as was discussed, as the court I believe recognized, the independent voters had specifically rejected the exact argument the comment's making here. Independent voters, they claimed that based on principles of unjust enrichment, there should have been no refund because their actual return on equity turned out to be lower than what they thought should have been provided under the act. And actually they used even the same proof that Conrad uses here. The same evidence they wanted to put in support of that in independent voters was that the commission had later on approved, prospectively, rates based on that time period which showed that their return on revenue was too low. But the court said no, that would not affect the refund. And the reason why was because that's not the harm that's being redressed by the refund remedy. The harm that the remedy was fashioned to redress was that under this court's statutory judicial review, at a point in time, it declares the approved rates unlawful. However, under the statutory scheme, the utility would still be allowed to collect and customers would be paying revenues based on those already declared unlawful portions of the rate increase. And that's what the refund is defined by. That's why the court explained it wasn't. They weren't creating an exception to retroactive rate making. They were, in fact, saying because of the nature, because of the scope, the contours of what this remedy is, it was not actually retroactive rate making. All it was doing was, the only thing that was happening was it wasn't reopening the case, it wasn't going back to use of subsequent data from later periods in time. It was sending it back so that the commission would look at the revenues that are collected under the actual revenues that are collected under the reverse rate order from the period of time that it was declared unlawful going forward and then compare that to the rates that would have been collected if the rate order had been issued in accordance with the reviewing court's opinion. Only ComEd refers to the remedies based on doctrines of restitution or unjust enrichment. Independent voters have rejected the defense based on unjust enrichment and actually had previously rejected the party's arguments to fashion a refund based on the doctrines of restitution. So I think independent voters support your position. The question is whether Harding changed that paradigm at all. Correct, Your Honor, but he didn't. What he actually did was reaffirm the central holding of independent voters. Now, in support of the argument, counsel refers to the 1989 data for purposes of setting the refund in the year 1989 that they would actually use the cost from the other plans. But that was not retroactive rate making. That was the only reason they could consider that actual data was because of the odd posture of the case, that that was based on the other tariffs, the later filed tariff applications for rate increases based on those plans for the period where to increase the rates were actually starting in 1989 and there were actually successive tariffs filed for later periods of time as well. And yet the oddity that in the parallel proceedings litigation going on, which would be the BPI litigation, the cases they cited in the Supreme Court, based on those other plans, that actually not only was it reversed, it was actually the original rate making order was declared void for lack of jurisdiction. And because of an agreement that commented in that case, they rolled back the rates all the way back in 1989. So there were no proper rates at that point being set in 1989. It was still being litigated. And at that point they didn't know what the proper rates under the new successive tariffs would be for those other plans and for that period of time going forward. So there was no retroactive rate making. There was not any kind of indication that somehow the 1989 period was now that we're going to look at new and new, that the courts, sorry, that the commission, when looking at it in a fashion of a refund, should be looking at actual data in the future during the refund period. Which, in your opinion, would be retroactive rate making if we look at the actual data in this case? Yes, Your Honor. That would be retroactive. I want to address the third quarter plan additions before your time runs out. And if you could comment on the fact that the commission, the comment points out language that the commission seemed to indicate in its findings that the Commonwealth Edison abandoned third quarter plan and didn't present any sort of little testimony. Your Honor, I don't believe that's what the commission was doing there. The commission, while it was clarifying there, it was making the factual finding that the third quarter plan additions didn't meet the pro forma adjustment requirements in order to include it, that it doesn't have to make out every single specific factual finding underlying that finding. And if you go through the rate order beforehand, it clearly reviews ComEd's new evidence in the ComEd section and actually reviews it again when it reviews the people's evidence and the staff's evidence and the whole dispute over whether or not those third quarter plan additions should be included. The evidence it all talks about primarily, other than it talks about both the evidence from the original proceedings, that is the staff witness Griffin, on which it bases, on which the commission bases its factual finding, and on ComEd's new evidence, which had been allowed into the record, about whatever the actual investments in the third quarter 2008 plan additions was. It didn't specifically say that the state, it was rejecting those. But when it's saying that they didn't, that ComEd's new evidence, evidence that they never addressed the Buddle or the Sir Buddle testimony, it was that they were basically, they were making, the commission was making a decision. It was favoring the witness testimony of Griffin over the evidence that the commission, that ComEd was offering, the actual plan additions. And because Griffin had actually, even his old testimony had recognized that yes, plan additions then were starting for the third quarter, because the third quarter, the rate case came out just around the third quarter, and that something would be reasonably likely to occur. The problem was there wasn't evidence about what would be reasonably likely to occur, and more importantly, that the amount was determinable. And that was really the key issue, that in the budgets that it could look at from 2000 to 2008, 2007 to 2008, there were varied budgets and amounts, and it just would not be determinable for that third quarter in time. There's nothing so strange about the commission making a decision that projections going forward about new investments would, could be reasonably likely to occur and be determinable and measurable. Up until a certain point in time, here in the second quarter, but not into the third quarter. The attorney general did not argue in the earlier appeal that ComEd, the commission actually made this finding by not addressing it. That's correct. We didn't make that argument. The argument on the original appeal, if I remember correctly what it said, it was that ComEd had forfeited the issue by not requesting to the commission that they include the third quarter through their stipulation agreement. However, that position was rejected by this court. So we did not, we are continuing to put forward that position here. We obviously didn't gain anything from that position either, so it could be held as a stop in any sort of way. In its exceptions to the order, didn't ComEd ask for findings regarding third quarter plans? In the original rate order? It did, Your Honor. It's actually in the original rate order what happened was that the ALJ was going ahead and had rejected their position on accumulated depreciation, but then made a different finding on the third quarter. So in the exceptions, they had argued in favor to the commission for the original rate order. They had actually argued in favor of the third quarter. Yes, that's correct. And so it was before the court in that sense. The argument is before the court. I don't know. Go to Selma. So, Your Honor, by following independent voters and using the data in the exact same way that the independent voters used it and rejecting the same defense of adjustment enrichment that was made in independent voters, the commission did not err in refunding approximately $36,700,000 to ComEd's customers and also substantial evidence supported its finding that the third quarter 2008 plan additions did not meet the pro forma adjustment requirements. Thank you, Your Honor. Mr. Price, rebuttal argument. Thank you, Your Honor. Let me briefly address independent voters and then turn to Harrigan if I may. I'm happy to answer any questions about the third quarter plan additions as well. In independent voters, everyone agreed that the rates reflected operating expenses that were improper and should not be charged when they were calculating the refund. There is no question that those operating expenses shouldn't have been there. This case is different in the sense that here everyone agrees ComEd should be able to recover its rate base. And the question is how do you value that rate base for purposes of figuring out what the appropriate refund should be? Do you value it based on 2008, that is, the original outdated data, or do you value it based on data from the refund period? That's the question that is at issue in this case, and that's the question to Harrigan, which also involved the question of how you value rate base for purposes of a refund. That's the question Harrigan addressed. And if you were to accept— But in independent voters, you're saying that everybody agreed they shouldn't get anything on their rate base? They shouldn't have a rate base? I mean, there are certain items that were excluded, but they should still have a rate base excluding those items. Well, those were operating expenses, Your Honor. There's operating expenses and there's rate base. So rate base was not even at issue in independent voters. It's operating expense items that shouldn't have been there. And the question in this case, in the last appeal, was how do you properly value a rate base? And for purposes of the refund, it's how do you value the rate base for establishing a refund? Now, if in Harrigan the Supreme Court had applied the methodology proposed by the commission here, much of this opinion would be superfluous because all it really would have needed to do was say, okay, we're going to go back to 1985, look at the rate base from 1985. We're going to knock off an additional $190 million in costs from that rate base, and we're going to recalculate the rate. That's all that would have needed to have been done. But the Supreme Court went on at length in talking about a very different approach where you compare Rate Order 2, which the Supreme Court says we presume reflects actual cost increases that occur between 1985 and 1988 when Rate Order 2 is entered. We compare Rate Order 2 to the original Rate Order. So the Supreme Court is accounting for changes in costs that occur through that time, and likewise for 1989. The Supreme Court said we don't know what the right rate for 1989 would be for purposes of establishing a refund because the commission hasn't set that yet. And when it does, it's going to account for the fact that since 1985, ComEd has made lots of investments in a new plant that need to be reflected in what the just and reasonable rate for 1989 would be. Again, that discussion would make no sense at all on the commission's view of how refunds should be calculated in this kind of case. So, you know, respectfully, we think Hardigan really commands the result of looking at actual costs matched to actual revenues for a refund period. Do you agree that independent voters rejected your argument? Well, I think independent voters, again, dealt with certain improper operating expenses. The same question was raised, was it not? I mean, do we consider actual operating expenses? And independent voters said no. Well, what independent voters involved was ComEd's attempt, or I'm sorry, Illinois Bill's attempt in that case to say, okay, well, we have these improper operating expenses, but we want to try to offset those with investments we made. And the court there said, well, we're not going to let you offset improper operating expenses with investments. We're not going to allow that. You know, maybe that's apples and oranges. But the point is here, we're dealing with how do you value a rate base? There aren't any improper investments that have been made. The question is how do we value the investments that have been made that everyone recognizes ComEd has a right to recover? Doesn't that lead, though, to a two-and-a-half-year test period or test year? Isn't that what Mr. Wegging's statement, that that leads to a two-and-a-half-year test year? Doesn't your argument ultimately lead to that? No, Your Honor. What it leads to is looking at the eight-month period between September 2010 and May 2011, which is the refund period at issue here, and saying during that eight-month period, what were the actual value of ComEd's invested capital that rate payers were benefiting from, that they were using the investments that that rate base reflected? What was that value? So it's even more than two-and-a-half years. No, it's just the eight-month period from September 2010 to May 2011. That's the relevant period that we're focused on. And the question is what was the value of ComEd's rate base during that period, and how does that compare to the original rate base that was considered by the Commission back in the invalid rate order? That is the methodology that Hartigan commands, and there's nothing overly complicated about it. The evidence would have been in the record in this very case if the Commission had been willing to consider it. And respectfully, I don't think it requires reopening the entire proceeding or any kind of difficult administrative activity of that kind. It's a very simple inquiry, and the evidence exists for it. And just to sum up, the last point I'd make is it's really important to keep in mind the fundamental purpose of this is to do equity. And when the Commission itself has recognized that during the very period of issue here, ComEd was under-recovering costs, which means that rate payers were not paying the full fair value of the services they were receiving. When the Commission has made that determination, it would not be fair to require ComEd to refund extra money on top of that. Do you agree that the same argument was made in independent voters regarding equity? Well, again, Your Honor, first of all, it's not clear to me in independent voters whether the court was focused on matching actual revenues to actual costs. There's no discussion there of what revenues the court is looking at. That was a principle that was really distilled for the first time by the Supreme Court in Hartigan. So, again, I don't know in independent voters whether there is the same sort of mismatching that you have in this case. Thank you, Your Honor. I'd like to thank all the attorneys for their evidence in this case. The case has been taken under advisement. The decision ran in due course, and we are adjourned.